Joseph Leon WRIGHT, Plaintiff-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

March 20, 1974.

Certiorari Denied by Supreme Court
June 3, 1974.

John C. Robertson, Memphis, for plaintiff in error.

David M. Pack, Atty. Gen., Weldon B. White, Jr., Asst. Atty. Gen., Nashville, Leonard T. Lafferty and William E. Frulla, Asst. Dist. Attys. Gen., Memphis, for defendant in error.

O'BRIEN, Judge.

## OPINION

The jury found this defendant guilty of murder in an attempt to perpetrate robbery and fixed his punishment at imprisonment in the State Penitentiary for ninety-nine (99) years. The trial judge entered judgment accordingly. Motion for new trial was heard and overruled, appeal granted and the matter is now properly before this Court.

The first three assignments go to the weight and sufficiency of the evidence, it being alleged that the evidence preponderates in favor of defendant's innocence; the court erred in not granting the defendant's motion for a directed verdict; and that material conflicts in the testimony of the State's witnesses as well as doubtful identification testimony of the defendant renders the verdict against the weight and preponderance of the evidence and against the verdict of guilty.

The State offered the testimony of two eyewitnesses to the homicide of Eddie Lewis Hammond, who died of a gunshot wound inflicted in the early morning hours of December 24th, 1972, at the intersection of Kansas and Fields Streets in the city of Memphis.

Odell Ester testified he was in the company of Hammond from about midnight until the time of the homicide. He visited with him at his home where the witness was offered, and accepted, a drink. He did not observe Hammond drink anything but did not know whether or not he had consumed anything prior to his arrival. They then went together to the Lattery Club, which they decided not to enter because of the cover charges, and then proceeded to a cafe at Fay and Kansas Streets where they found a dice game in progress. Hammond participated in this game of chance for about fifteen minutes and purportedly lost $2.00. He then purchased a package of cigarettes after which he and the witness left the cafe and began walking down Kansas Street. They had proceeded approximately two blocks, and as they reached the corner in front of a church somebody came up from behind. Hammond sort of twisted around, the assailant held a gun to his neck, mumbled something about money, and shot him. They had been walking side by side, with Hammond on the inside and the witness outside, next to the street. The assailant came between them and pushed the witness forward. When the witness heard the shot he turned around and started running back in the direction of the cafe. As he ran he observed someone else on the other side of the street running the way he was running. The witness made positive in-court identi-

fication of the defendant as the person who shot Eddie Lewis Hammond. This witness ran first to his home, where he told his mother what had happened. His step-father brought him back to the scene of the homicide. The witness testified that at the time of the shooting he was about four feet from the defendant who was unaccompanied.

On cross-examination, the witness testified that among others present in the cafe before they left was a man named Gerald Boyce, whom he had seen around, but didn't know. He also saw the defendant in the cafe, as well as ten or eleven others who were in the room where the dice game was being held. He denied ever having talked with or associated with Gerald Boyce on a friendly basis. After the shooting he ran before the deceased had fallen to the ground. He did not observe what the assailant did after the shooting. The whole event took place in just a very few seconds. He was able to observe what took place before he ran because there was a street light across the street. He was not able to tell who the other person was whom he saw running after the shooting, except that it was not the assailant. He later learned the man who was running across the street was Gerald Boyce and stated he had seen him on at least two instances after the shooting at Carver School but had not discussed the case with him. He talked with the police at the scene of the homicide. The officers asked if he could describe the assailant and he told them he could not tell them how he looked but he could identify him. He had seen some people in the cafe, but he was not sure if defendant was one of them. He did not return to the cafe with the police officers because they took him to the police station for questioning. Gerald Boyce and the defendant were still in the cafe when the witness and Hammond left.

Gerald Anthony Boyce testified that he arrived at Stevenson's Cafe on the night of December 23rd, at about 10:00 or 10:30 p. m. He joined the dice game which was already in progress and lost $3.00. About an hour later Eddie Lewis Hammond and Odell Ester came in. Hammond joined the game and lost $2.00 from a $10.00 bill which he changed while playing. He stayed long enough to lose the $2.00 and then left with Odell Ester. The witness said he was acquainted with Ester. After these two left, defendant asked the witness to go around on Lucca Street with him to get some money. He knew defendant lived on Lucca Street. Defendant told him to go out the front, defendant went out the back and joined him in front of the cafe. When they met in front of the cafe, defendant commented, "She is not around there". Defendant then crossed the street and began running down Kansas Street on the left hand side while the witness began walking down the right hand side on which the cafe was located. By the time witness had reached Lucca Street, which was approximately a block, defendant had run an additional block to the intersection of Kansas and Fields. The witness saw him grab someone, a few minutes later he heard a shot then saw Odell Ester running toward him. As Ester came close to the witness he said, "Oh Lord". The witness ran across the street and ran behind the apartments where he lived, directly across from Kansas and Lucca. He ran around the back, returned to the cafe, retrieved his coat, and departed for home. When he got home he told his father what had happened. While they were sitting there talking, the witness' brother came in and said he had just seen a man laying dead on Kansas Street. About twenty or thirty minutes later, defendant came to the house with a third person, whom the witness did not see. He told his sister to tell defendant he was not at home. About 5:30 or 6:00 in the morning the police officers came to the house and took him to homicide where he related what had happened. The witness saw defendant again on Christmas night at the Lattery Club. Defendant said he'd heard the police had questioned him and inquired what the witness had told them. The wit-

ness replied he didn't tell them anything, that he didn't know what happened and ran, because he didn't want to get hurt himself. Defendant responded, "Well, I can beat this then, if that's all you told 'em." He was not able to observe what defendant did at the scene before he ran, but after he had returned home he looked out the window and saw defendant turn off Kansas onto Lucca Street walking in the direction of his home. This was some thirty minutes before defendant came to his house in search of him. He testified that when the defendant came around from the back of the cafe to join him he observed a Luger type gun sticking out of defendant's pocket.

On cross-examination he testified that after he lost $3.00 in the dice game, he borrowed a dollar from Cilvester Weekley and won some money in the game, winding up with a total of $9.00. He said that after defendant crossed Kansas Street and began running down the other side, he watched him re-cross the street in front of the church and in front of the two men. He couldn't tell exactly whereabouts he was but he did not come up from behind them. He was closely cross-examined about this and said, "Not—you know how you slant and cut somebody off, not in—directly from the front". "Yeah, he cut across in front of 'em like". He says after he returned to the cafe to get his coat he repaid Robert Fox $3.00 which had been borrowed sometime before and then left straight on out. Cilvester Weekley asked to be repaid but he did not pay him. He says he knew Odell Ester by sight before this incident occurred, but did not know his name until then. He stated he had seen him subsequently at Carver School at a dance, and they had talked. He did not recall talking with him about the case on any other occasion.

Cilvester Weekley made an in-court identification of the defendant as one of the persons present in the Arthur Lewis Stevenson Cafe on the night of the homicide. Defendant lost $35.00 to him in the dice game, and borrowed $5.00 from him which he lost to someone else. Witness says he loaned $2.00 to Gerald Boyce. He says the defendant left the dice game about 12:00 or 12:30 p. m. Prior to leaving the cafe defendant said something, "to the man in the rear with the sweater on—with the blue sweater on". Witness was apparently referring to Gerald Boyce in the courtroom. He says the defendant went out the front door, and returned in approximately 45 minutes. When he returned he sat in the front part of the cafe, on the last stool at the bar, talking to the proprietor's wife. At that time the dice game had ended. He saw the defendant leave one more time, just long enough to possibly stand out front, then come back in, shortly after that the police officers came.

On cross-examination he identified Gerald Boyce in the courtroom as one of the men participating in the dice game, who had borrowed $2.00 from him. He knew that Wright had left the cafe because he had heard Boyce tell him, "let's go", during the course of the game. That is why he noticed him leave. He says both Wright and Boyce left by the front door. He saw Boyce return to the cafe and says that he was also gone for approximately 45 minutes. He saw Boyce pay Fox something like $5.00. He asked for repayment of his money and Boyce said, "Well, I ain't got time". He was not sure whether Wright had returned to the cafe when Boyce came in for the second time.

Richard O. Parker, detective on the Memphis Police Department, testified that he investigated the homicide.

William Turner testified he was assigned to the homicide bureau of the Memphis Police Department and investigated the homicide. When he reached the scene of the shooting he learned from uniformed officers that Hammond had been shot and killed, and had fallen on his back on the sidewalk. He observed the body at the scene. Hammond and another male negro, Odell Ester, had been at Arthur Lewis' Cafe, just south of the location of the

body. They had left the cafe and were walking north on Kansas. As they approached Fields Street a male negro approached them from behind, grabbed Hammond, pulled a gun, and asked him, "Where is my money", then the victim was shot, and knocked to the ground. When they arrived the victim was lying on his back with his trousers pockets turned inside out. They found a .22 caliber hull in the vicinity of the victim's feet, a black wallet on the grassy strip between the sidewalk and curb, and two twenty-five cent pieces near the right side of his legs. As a result of talking to witness, Odell Ester, they went to Arthur Lewis Stevenson's Cafe. At the cafe they talked to Arthur Lewis Stevenson, and Cilvester Weekley. They arrested Weekley for carrying a .32 blue steel automatic pistol. They took Stevenson back to the scene of the shooting to identify the victim; after viewing the victim Stevenson was also placed under arrest because of conflicting stories about whether the man was in the cafe or not, and what he was doing in the cafe. After talking with Arthur Lewis Stevenson they continued their investigation and attempted to locate "Sunny Bunny", whose true name was Joseph Leon Wright. Odell Ester was present when they talked to Stevenson. He had been detained to obtain a written statement, and was not under arrest. They also precipitated a search to locate Gerald Boyce, who was found and interrogated concerning his activities at the time of the homicide. Odell Ester made an identification of Wright from photographs shown him during his interrogation. In their efforts to locate Wright the information held by the detective division was relayed to the uniformed officers working in the area of the shooting. A broadcast was put out for each person and each shift of uniformed officers as well as each shift of officers in the homicide bureau were advised that Wright was wanted in connection with the shooting. Wright was arrested on Wednesday, December 27th.

On cross-examination of Detective Turner it was brought out that Odell Ester did not advise the officers at the scene of the shooting that the person who had done the shooting had been in the cafe shortly before. He was not questioned at that point about whether he had ever seen the man before. The officer was not able to say that he had seen Wright in the cafe when he went there some fifteen minutes after his arrival on the scene. Defendant turned himself in to the Homicide Bureau at the time of his arrest.

Dr. Jerry Thomas Francisco, chief medical examiner for the State of Tennessee, testified he had performed an autopsy on the body of Eddie Lewis Hammond. There was a gunshot wound present in the right neck area at the angle of the right jaw, with the bullet penetrating through the various vessels and structures of the neck. The bullet was removed from the neck of the victim. The alcohol content in the blood of the deceased was .09 percent, $\frac{9}{100}$th of one percent alcohol, which indicated that if taken at one time, it would require a minimum of five to seven drinks to attain this level. If the drinking were done over a three hour period it would require eight to ten drinks to attain this level. The .09 level might represent being under the influence, but would not necessarily represent being intoxicated.

On behalf of the defendant, Carolyn Stevenson, wife of the proprietor of Lewis' Grill, testified that defendant was in the cafe from about 11:00 p. m. and never left the cafe until closing time about 2:00 a. m. Wright participated in the dice game which was going on in the kitchen at the rear of the cafe. Later in the evening she learned a man had been killed a couple of blocks from the cafe. This man had come into the cafe about 11:30 or 12:00, played in the dice game, and left a short time later. She says when Wright came out of the dice game he asked about his girlfriend and she told him she imagined the girl had left. He walked to the door and looked out, he said, "well, she's gone", then came back and sat down, and continued the conversation. She had seen Gerald Boyce,

who had engaged in playing at dice, and later left the cafe. She thought he left after Hammond had departed. She guessed that Wright had been sitting at the bar about fifteen minutes before Hammond left the cafe. She saw Boyce return, get his coat, give some money to Robert Fox, and leave.

On cross-examination she says Gerald Boyce left the cafe by himself after Hammond was gone, but Joseph Leon Wright never left the cafe. She did not hear Wright ask Boyce to leave. She saw Boyce leave through the back door. She says that Wright came out of the kitchen, came to the bar, asked about his girlfriend, went to the door, came back and told her the girlfriend was gone, went back in the kitchen for a little while, came back to the bar, sat down, and they talked about numerous things. Her brother-in-law, Earl Watts, was present. She says that Wright did not order a beer at that time. It was a few minutes after Boyce left when Wright came to the bar and sat down. She says the back door was barred with a two by four across the door. That this two by four was never off the back door.

Robert Fox was called for the defense and says he arrived at the cafe about 10:30 p. m. Wright came in after he got there, and joined in the dice game. He knew that the deceased, Hammond, had been in the game also. Both Wright and Boyce left the game before it was over. He did not see either of them leave out the back kitchen door, and heard no conversation between them. Wright left the game about ten or fifteen minutes before it broke up. He was of the opinion that Hammond was already gone. When the game broke up he went to the front part of the cafe and bought a quart of beer and talked with Wright and the proprietor's wife. Wright did not appear excited. For a period of ten or fifteen minutes the witness was not paying any attention to where Wright went, but when he went to the front of the cafe Wright was there. Gerald Boyce was not in the cafe but came in later, paid him

$3.00 to apply on a coat he had sold him. Boyce made no comment about having witnessed a shooting.

On cross-examination he stated he considered Wright a good friend. He says that nobody ever walked out the back door while he was there and it was never opened at any time that night. He does not know exactly when Wright left the dice game, but when it broke up between 12:30 and 1:00 he went to the front of the cafe and found him sitting on the bar stool. He and Wright each drank a quart of beer with each of them paying for their own. They were served by Mrs. Stevenson who was behind the bar. There was no one else besides him, Carolyn Stevenson, and defendant sitting at the bar.

Shirley Wright, thirteen year old sister of the defendant, said she was a student at Carver High School and had observed Odell Ester and Gerald Boyce talking together at the school on the 3rd of January after her brother had been arrested. About two days later she observed them in conversation again.

■ We cannot find that the verdict of the jury in this case is against the weight and preponderance of the evidence. The evidence was sufficient to submit the case to the jury and we cannot find any abuse of the trial judge's discretion in denying a directed verdict of acquittal. See T.C.A. Sec. 40–2529, and Rambo v. State, Tenn.Cr.App., 472 S.W.2d 911. It is obvious from our review of this record that there were numerous discrepancies in the testimony of the witnesses for the State and for the defendant, however conflicts in the testimony of the witnesses are ordinarily resolved by the verdict of the jury. The credibility of the witnesses is for the determination of the jury. Wilson v. State, 2 Tenn.Cr.App. 468, 455 S.W.2d 172. We think the major conflict, which might be considered material, is the difference in the testimony of the witnesses Ester and Boyce about whether the assailant approached the victim and his companion

from the back or from the front. The witness Ester was there with Hammond. He testifies the assailant came from the rear and knocked him forward while he was assaulting the victim. On the other hand Boyce, who was standing a block away, at the time of the shooting, testifies that Wright left him in front of the cafe, crossed Kansas Street, ran up the other side, and angled back across the street. There can be no question that Ester's vantage point would enable him to view the scene and circumstances with more particularity. It would also appear extremely unlikely that the victim could have been assaulted by an assailant who came at him from the front where he would be easily visible. It is apparent the jury took this into consideration in rendering their verdict. The conflicts in the testimony notwithstanding, the trial judge properly instructed the jury on identification of a defendant and the jury resolved the conflicts in the testimony of the witnesses. See Gann v. State, 214 Tenn. 711, 383 S.W.2d 32; Brown v. State, 1 Tenn.Cr.App. 294, 441 S.W.2d 485; Schweizer v. State, 217 Tenn. 569, 399 S.W.2d 743. We conclude that the first three assignments of error must be overruled.

The fourth assignment contends that defendant's rights were prejudiced by questions and answers elicited from Officer Richard O. Parker, to the effect that after the officers talked with a person by the name of Arthur Lewis Stevenson, and after certain statements were made by him they began to search for the defendant for killing the deceased.

This assignment is not borne out by the record. The actual questions and answers were solicited from the witness, Detective Turner.

It is suggested for the defense that the attorney general was successful in getting before the jury the fact that after talking with Arthur Lewis Stevenson the police began looking for the defendant. That this was extremely prejudicial since Stevenson, although available in Shelby County on the date of the trial was never produced by the State as a witness and therefore the defendant was denied the right of confrontation by his accuser. It is clear from our reading of this record that the dialogue in the court room which is now assigned as error, was not brought about by the overt conduct of the State's attorney, but resulted from successful objections raised by defense counsel. Moreover, it does not appear from the record that this witness was not equally available to both parties. The State is not required to call every witness who has any knowledge of the facts. State v. Bomar, 214 Tenn. 493, 381 S.W.2d 287. The real object of investigation in court is to ascertain the truth of the case, in order that the judgment of the law may be had on the facts. We do not find prejudice to the defendant, and the fourth assignment is overruled.

By the fifth assignment it is said that the defendant's rights were prejudiced by the closing argument of the State to the effect that it was uncontradicted that defendant had a gun on the night of the homicide. It is argued on the premise that the argument was misleading, improper, and in fact, a comment on defendant's failure to testify at trial in violation of his constitutional rights and in violation of T.C.A. Sec. 40–2403.

T.C.A. Sec. 40–2403 has been invalidated by the United States Supreme Court in Brooks v. Tennessee, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358, on the premise that the statute violated an accused's constitutional right to remain silent insofar as it required him to testify first for defense or not at all. Argument by counsel for the State to the fact that the evidence of the State is uncontradicted is not improper as drawing the attention of the jury to the failure of the defendant to testify. Williams v. State, 164 Tenn. 562, 51 S.W.2d 482. The final argument is not included in the bill of exceptions, which is the obligation of counsel, and is not to be considered here under those circumstances. The assignment is overruled.

The sixth assignment goes to the failure of the State to introduce the testimony of Officer Noblin as a witness in the case. This officer was present at the interrogation of the witness, Odell Ester, shortly after the shooting. The State brought out that this officer was testifying in a trial in another county on the date of defendant's trial proceedings. We have already dealt with this question in regard to the testimony of another witness in considering assignment of error No. 4. There is no merit to this assignment which is overruled.

The last assignment of error is also without merit. It is contended that defendant's rights were prejudiced by the failure of the police to take immediate steps to apprehend him. Defendant was arrested four days after the crime. State's evidence clearly shows that efforts were initiated to locate him within hours after the investigation began. There was no prejudice to defendant's right to a fair and impartial trial.

Judgment of the trial court is affirmed.

DWYER and RUSSELL, JJ., concur.