# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JULY 1996 SESSION



FILED

June 11, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. No. 02C01-9512-CR-00390 |
| | ) | |
| Appellee, | ) | SHELBY COUNTY |
| | ) | |
| VS. | ) | Hon. Jon Kerry Blackwood, Judge |
| | ) | |
| DERENZY TURNER and | ) | (Felony Murder and Attempted |
| | ) | Aggravated Robbery) |
| VERNON WEST, | ) | (Second Degree Murder) |
| | ) | Nos. 95-00953 and 95-0094 |
| Appellants. | ) | |

FOR THE APPELLANTS:

Turner:
WILLIAM C. GOSNELL
3074 East Street
Memphis, TN 38128

West:
RANDALL B. TOLLEY
242 Poplar Avenue
Memphis, TN 38103

FOR THE APPELLEE:

CHARLES W. BURSON
Attorney General and Reporter

ROBIN L. HARRIS
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

JOHN W. PIEROTTI
District Attorney General

REGINALD R. HENDERSON
PHILLIP GERALD HARRIS
Assistant District Attorneys General
201 Poplar Avenue
Suite 301
Memphis, TN 38103-1947

OPINION FILED:_____

AFFIRMED IN PART AND REVERSED IN PART

CORNELIA A. CLARK,
Special Judge

## OPINION

Defendant Derenzy Turner was indicted for first degree premeditated murder, murder in the perpetration of a robbery, and attempted aggravated robbery. Defendant John Donald was indicted for the same offenses. Defendant Vernon West was indicted for first degree premeditated murder and murder in the perpetration of a robbery. Donald's case was severed from that of his co-defendants. Defendants Turner and West were tried together.

Turner was convicted by a jury of felony murder and attempted aggravated robbery. He was sentenced to life with the possibility of parole on the murder conviction and to five years for the attempted aggravated robbery conviction. West was convicted of second degree murder and sentenced to twenty (20) years.[1] Both defendants have appealed as of right.

Turner does not appeal his conviction for attempted aggravated robbery, but raises for review six issues addressing the sufficiency of the evidence as to his felony murder conviction. West raises seven issues for review: (1) sufficiency of the evidence, (2) whether the jury properly considered the evidence of self defense and the jury charge on that issue, (3) whether prosecutorial misconduct affected the verdict, (4) whether trial counsel was ineffective in not calling John Donald, Jr. to the stand and not moving for severance as to Derenzy Turner; (5) whether including the word "defendants" in the charge of "criminal responsibility for the conduct of another", which was addressed only to co-defendant Turner, confused the jury to the prejudice of West, (6) whether both co-defendants can be convicted of murder when one bullet was the cause of death, and (7) whether West's sentence of twenty years is excessive. We reverse Turner's conviction for felony murder, but affirm the judgment of the trial court in all other respects.

## I.

---

[1]At the close of the state's proof the trial judge granted a judgment of acquittal for West on the charge of felony murder.

We begin with a brief recitation of the facts. The unusual fact pattern is determinative of some issues in this case. In particular, the question of who fired the fatal shot was contested strenuously at trial.

On the day of the murder Vernon West was carrying a 9-mm. Glock handgun belonging to his fiancee's nephew. He had possession of the gun because his fiancee and her sister had asked him to hold it to keep the nephew out of trouble. West carried the gun underneath the seat in his truck, intending to place it eventually in his mother's safe.

West stopped at Southland Mall to have cleaned several gold chains that he wore around his neck. Keenan Washington was the shop owner who cleaned the chains. While waiting for the work to be performed, both West and Washington were invited by another individual to attend a concert. West accepted, but waited for Washington to finish his work.

According to Katrina Bates, Derenzy Turner and John Donald, who were friends, first saw West at the mall. They noticed the gold chains he wore, and began making plans to follow West and rob him of the chains. West noticed them there, but did not know them.

After Washington's store closed, he and West left the mall and went to Red Lobster, where West's sister worked, to park West's truck. At that time West took the 9-mm. gun from his truck because he did not want to leave it at a place where he knew break-ins had occurred. He carried it with him. While in the parking lot, West noticed a black car loitering nearby.

West and Washington next stopped at a liquor store. They then traveled to the Dodge Store, a service station and convenience market. Washington went into the station and West went to the outside restroom. According to him, as he exited the bathroom, John Donald appeared, pointed a pistol at his head, and attempted to steal his gold chains. At that point Turner drove up to West and Donald in a

3

black Beretta and told Donald to "put the gun up", apparently because too many people could see what was happening. There was also an elderly man on the scene, who tried to proceed to his car. West attempted to move to the car with the elderly man, but Donald followed him. West then got in the car with the elderly man, who stopped the vehicle. Donald approached West again. West picked him up and slammed him down on the hood of the car, continuing to hold him down. Somehow Donald got loose, took his right hand, and flipped his own gun back over his head. West believes it landed somewhere in the parking lot.

Once the altercation was over, West went to Washington's car. Donald went toward the Beretta. West was frightened. He did not go into the store to get help. When he found that the keys were not in the ignition and that Washington had not returned, he used a speed loader to load the seventeen-bullet, 9-mm. weapon. According to West, he then walked toward the store to find Washington.

While West and Donald were fighting near the bathroom, the victim, Vicki McKinney, and her children were leaving the Dodge Store and entering their car. Daughter Kenya, who was thirteen, was in the front passenger seat. She saw West and Donald wrestling. She also saw West leave and load his gun. She saw him walk first to the back of the car, then toward another area, and then he started shooting. She testified that it was West who shot first and that the driver of the black Beretta only returned fire. A gunfight ensued between West and someone inside the Beretta.

A little boy apparently informed a store security guard of the altercation going on outside the store. The security guard, Tyrone Simpson, went to investigate and got within arm's length of West. He saw West get a 9-mm. Glock from his car and start shooting at the Beretta. He shot until he emptied his gun. Simpson also observed 9-mm. shell casings after the cars left the lot. Simpson testified that the

4

shots returned came from a smaller caliber gun. Simpson never actually saw shots fired from the black Beretta.

Michael Sims also testified for the state that West shot first. Sims saw West (whom he identified as the man with the 9-mm.) get his gun from his car and then saw him shoot over the McKinney car. He used the McKinney car as a shield when an individual in the Beretta returned fire. He moved with the car as it moved. Sims assumed that the person with the 9-mm. fired the most shots because he emptied his gun out.

As the shooting continued, the Beretta began to move across the parking lot as though exiting.

Vicki McKinney started her car and attempted to drive out of the Dodge parking lot at about the same time the Beretta was leaving. She drove her car across the path of the Beretta and into the middle of the exchange of gunfire. She was shot in the left temple during the shootout, and crashed her car into a pole on the street a short distance away. She never regained consciousness, and died several days later in the hospital.

Kenya McKinney testified that her mother was facing forward when she was shot and that West was behind them. Kenya said she never ducked, but she did turn her head as she looked around the scene. She did not see Vernon West ever point a gun directly at her mother on the left side of the car, but acknowledged that he also continued to move around. She did not observe him every second.

A major issue between the two defendants concerned who fired the fatal bullet. The bullet came from a 9-mm. gun. There were no bullet holes found in the McKinney car itself. West's gun was a 9-mm., and, according to the ballistics

5

expert, the markings on the fatal bullet were very similar to those found in West's gun. However, the bullet recovered from the body was too mangled to determine absolutely if it had come from his gun. Nine shell casings from West's gun were found on the pavement. West told officers that the only gun shooting back at him was probably either a .22 or .25 caliber pistol. No other 9-mm. weapons were recovered.

Bryan Kelly, a navy veteran with weapons training, testified for West that he was present and heard shots that sounded like those of a 9-mm. gun coming from the black Beretta. He saw West run for cover. He never saw or heard him fire a gun. He never actually saw who fired any shots. On cross examination he admitted he never came forward to provide this information to the police. He first met West when they were in jail at the same time, and provided him the same information about which he testified at trial.

Ivan Thomas testified for West that someone in the black Beretta shot first, and that all the shots fired on both sides sounded as though they came from a 9-mm. gun. He also said West was never on the left side of the Beretta. He heard a total of eight or nine shots. On cross examination Thomas admitted that he was more than fifty yards from the site of the shooting at all times. He also acknowledged that he gave a statement to the police immediately after the shooting. In that statement he said West fired the first shots. He also said the shooter from the Beretta was probably using a .380 because he shot fourteen times, and that there was only one person in the Beretta. He also said there was a passenger in West's Malibu. He further admitted that he incorrectly stated on which side of the body the victim was shot.

West testified on direct examination that his location was different from where shell casings from his gun were found. He had no idea what gun John Donald used in the attempted robbery. West said he never saw the McKinney car.

6

He was not certain about the caliber of the gun returning fire from the Beretta. He admitted during cross examination that in his earlier statement to police he said the return fire came from a .22 or a .25 pistol.

## II.

Although defendant Turner raises six issues raised on appeal, all allege essentially the same concern - that the facts presented in this case are not sufficient to warrant a finding that Turner is guilty of first degree murder in the perpetration of a robbery or attempted robbery. West also challenges the sufficiency of the evidence by which he was convicted of second degree murder.

When an accused challenges the sufficiency of the evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or reevaluate the evidence and are required to afford the state the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this court. Id.

A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the state, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Because a verdict of guilty removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a

guilty verdict for lack of sufficient evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. Id.

## A. Turner

To support a conviction for felony murder, the state must prove that Derenzy Turner recklessly killed another person in the perpetration of or attempt to perpetrate a robbery. T.C.A. §39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear". T.C.A. §39-13-401(a). Aggravated robbery is robbery accomplished with a deadly weapon. T.C.A. §39-13-402(1). A criminal attempt occurs when a defendant, with the culpability required for the underlying offense, acts with intent to complete a course of action or to cause a result that would constitute the underlying offense, and the conduct constitutes a substantial step toward the commission of the offense. T.C.A. §39-12-101(a)(3). Finally, a party is criminally responsible for an offense committed by another if, acting with requisite intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. T.C.A. §39-11-402(2).

Turner argues that his conviction cannot stand because, to sustain a conviction for first degree felony murder, the killing must have been done in pursuance of, rather than collateral to, the robbery. State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988). The death of the victim must have had a close connection with the felony and not be separate, distinct, and independent from it. Id.; Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879, 833 (1956). The issue is whether the death results from a natural and probable or foreseeable consequence of the defendant's action in committing the underlying felony. However, when one enters into a scheme with another to commit one of the felonies enumerated in the

8

statutes and death ensues, both defendants are responsible for the death regardless of who actually committed the murder. State v. Brown, 756 S.W.2d 700 (Tenn. Crim. App. 1988), cert. denied, 498 U.S. 834, 111 S.Ct. 102, 112 L.Ed.2d 73 (1990).

Turner does not attempt to argue that acts committed by fleeing felons after the commission of the felony may not constitute felony murder. He argues instead that the theory of proximate cause in relation to felony murder is limited to acts committed by the accused or his accomplices in the underlying felony, which actually produced the death. State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988). Since the jury apparently found that West, the intended victim of the robbery, fired the fatal bullet, he contends he cannot be held responsible.

In Severs this court discussed at some length the "agency" theory of felony murder. We upheld a trial court's dismissal of a conviction of first-degree felony murder because the victim of the attempted larceny was the person who actually killed the defendant's co-perpetrator. This court held that the felony-murder rule may not be applied if a killing is attributable to the act of one other than the defendant or those associated with him in the original unlawful enterprise. Id.., citing People v. Washington, 62 Cal.2d 777, 44 Cal. Rptr. 442, 402 P.2d 130 (1965). To sustain a conviction for felony murder, the death in question must result from the effort to perpetrate rather than the effort to thwart the felony. Id.

Although we do not necessarily agree with the Severs analysis, we concede that Severs would require a reversal of the felony murder conviction if the killing of Ms. McKinney by the intended robbery victim is deemed to be collateral to the attempted aggravated robbery. That is not the case here. In finding West guilty of second degree murder, the jury determined that the attempted robbery ended before West went back to his car, loaded his weapon, and began firing. The murder was not committed in pursuance of the earlier attempted robbery but as a separate,

9

knowing act. Accordingly, though on a different basis, we reverse Turner's conviction for felony murder.

Turner has not appealed his conviction for attempt to commit aggravated robbery. That conviction stands.

### B. West

The bases on which West challenges the sufficiency of the evidence to support his conviction of second degree murder are different. He contends first that since the original police investigation concluded that Turner and Donald had caused the death of McKinney, he cannot now be held liable. West cites no authority to support his position and no such authority exists. At the time the initial investigation was done, the murder weapon had not been identified. At that time West had not turned in his gun or made a statement to police. Subsequent investigation did identify West's gun as providing the fatal bullet, and did identify witnesses who saw West shoot first. Many murder investigations begin with a focus on one suspect, only to shift as other evidence is gathered.

West next contends that he is not the person who fired the fatal bullet. He relies primarily on testimony from Kenya McKinney that she never saw West point the gun directly at her mother, and from other persons who stated that West was on the right side of the car during much of the shootout. West also argues that the evidence is insufficient because all witnesses did not testify that he shot directly at the victim, and because the ballistics report was inconclusive.

However, the testimony was not consistent about where West was at all times during the shooting. He used the victim's car as a shield and shot through and around it. As the car drove out of the parking lot it passed directly between the two shooters. West's 9-mm. gun is the only one of that caliber actually identified at the scene, and is most probably the source of the fatal bullet.

10

The evidence adduced at trial was sufficient to support a finding by a rational trier of fact that defendant West, using a 9-mm. weapon from which the deadly bullet probably came, utilized Vicki McKinney's car as a shield and shot through it or around it while initiating a shootout with persons from whom he had successfully escaped after they attempted to rob him. He continued to shoot at the car as the victim tried to drive away. The jury found that he committed a knowing killing of another. See T.C.A. §39-13-210(a)(1). The evidence supports that verdict. This issue is without merit.

## III.

West next asserts in his next five issues that:

(1)    the jury did not properly consider the defense of self-defense.

(2)    prosecutorial misconduct occurred when the prosecutors (a) "coached" Kenya McKinney's testimony, (b) failed to interview other witnesses once they decided to blame him for the killing, and (c) made improper statements during closing arguments.

(3)    his trial counsel provided ineffective assistance of counsel because she failed to move for a severance from Turner and failed to call John Donald, Turner's co-defendant on the attempted robbery charge.

(4)    the jury charge on "criminal responsibility for the conduct of another" was confusing and prejudicial because it uses the word "defendants" in the plural, but applied only to Derenzy Turner; and

(5)    he cannot be convicted of a one-bullet homicide because both co-defendants have been convicted of some form of homicide and because that would create "too much culpability in this homicide".

These issues were not raised in the motion for new trial, thereby denying the trial judge an opportunity to address or correct them. See T.R.A.P. 36(a). Procedurally, then, these issues have been waived. T.R.A.P. 3(e); State v. Walker, 910 S.W.2d 381, 388 (Tenn. 1995); State v. Williams, 920 S.W.2d 247, 257 (Tenn. Crim. App. 1995). Due to the gravity of the case we have considered the issues on the merits. See Walker, 910 S.W.2d at 388. The first, fourth, and fifth issues are clearly

11

without merit. We will discuss briefly the allegations of prosecutorial misconduct and ineffective assistance of counsel.

## IV.

West alleges three ways in which prosecutorial misconduct adversely affected the verdict in his case: (1) coaching a young witness; (2) failing to investigate statements of two witnesses who suggested someone in the Beretta had a 9-mm. weapon; and (3) making closing arguments laden with "innuendo, antics, facts not in the record, and misstatements of law". The test to be applied by appellate courts in reviewing instances of prosecutorial misconduct is "whether the improper conduct could have affected the verdict to the prejudice of the defendant". Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965).

During the cross-examination of Kenya McKinney, West's attorney questioned her about a prior inconsistent statement she gave police, and about whether her change in testimony was based on pressure from the prosecutor:

> Q. . . . And last year when you gave your statement you were asked which one of them was firing from this vehicle and you said the passenger in the front seat. Do you remember that?
>
> A. Yes.
>
> Q. Okay. Did you say that?
>
> A. Yes.
>
> Q. Is that true?
>
> A. I don't know which one it was.
>
> Q. Do you know why you would have said that last year?
>
> A. No.
>
> Q. Has someone talked to you since you gave this statement and said maybe that wasn't true?
>
> A. Maybe what wasn't true? What you just read? Yes.

Q. Who's talked to you and said maybe that wasn't true?

A. Him.

Q. Who are you pointing to?

A. Him.

Q. Mr. Henderson? This man right here? The prosecutor?

A. Yes.

Q. Okay. Did he talk to you about maybe what you said wasn't correct?

A. Yes.

Q. Is that why you are saying today you don't know?

A. No.

The phraseology "has someone ... said maybe [the earlier statement] wasn't true" came from the attorney, not the thirteen-year-old witness. The witness testified she did not change her testimony because of that conversation. On redirect, the following exchange occurred:

BY MR. HENDERSON

Q. Kenya, when we spoke with you, did we tell you that what you need to do is come up here and tell the truth?

A. Yes.

Q. Have you done that?

A. Yes.

MR. HENDERSON: No further questions.

It can hardly be prosecutorial misconduct for the district attorney general to ask a young witness to be sure her testimony is correct or truthful. There is no indication in this record that the district attorney general asked this witness to testify untruthfully. This issue is without merit.

13

West next contends that his right to a fair trial was violated because the state focused on proof that the fatal bullet came from his 9-mm. gun. He contends the state had a duty to call Brian Kelly and Ivan Thomas as witnesses because their testimony was favorable to him. He does not complain that their existence was withheld from him; in fact, he admits that he met Kelly in jail and sent him to his own attorney first. Both witnesses were called by West at trial, and their testimony was fully presented to the jury. Thomas' testimony at trial was inconsistent with the statement he originally gave to police. Kelly never fully explained why he did not go to the police with his information. West's only discernible complaint is that the prosecutor should have credited the trial testimony of those witnesses more.

It is without question that the state is not required to call any particular witness or to use all witnesses equally available to both sides, except when the state knowingly conceals a witness with exculpatory testimony. Hicks v. State, 539 S.W.2d 58 (Tenn. Crim. App. 1976); Wright v. State, 512 S.W.2d 650, 656 (Tenn. Crim. App. 1974). The state did not attempt to conceal these witnesses. This issue is without merit.

West last contends that the prosecution's closing argument contained several instances of misconduct. In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). We are guided by such factors as the intent of the prosecutor in light of the facts and circumstances of the case, the strength or weakness of the evidence, the curative measures, if any, undertaken by the trial court in response to the conduct, and the cumulative effect of the conduct. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Our Supreme Court has observed that "argument of counsel is a valuable

14

privilege that should not be unduly restricted. Our courts seek to give great latitude to counsel in expressing their views of the case to the jury". <u>Smith v. State</u>, 527 S.W.2d 737, 739 (Tenn. 1975). <u>See</u> <u>also</u> <u>State v. Bigbee</u>, 885 S.W.2d 797, 809 (Tenn. 1994).

West's argument on this point continues to focus on the assistant district attorney general's statements about premeditation, and his emphasis of West's liability over that of Turner. Since the jury convicted West only of the lesser offense of second degree murder, and convicted Turner of first degree (felony) murder, it seems clear this argument did not prejudice West.

As to more specific complaints, West notes that the prosecutors in both the opening and closing portions of their arguments said, "This is the Dodge Store . . . this ain't Doge City at high noon . . .". In the opening portion of the statement, the prosecutors said:

> It's not acceptable behavior to ride around with a loaded gun and to come into a parking lot full of people. And you know it's full of people. This is the Dodge Store on a Friday night on Elvis Presley in 1994. This ain't Dodge City at high noon in 1854. Maybe that was acceptable then, but it ain't now. Why? Because innocent people get killed. Innocent people like Ms. Vicki McKinney.

No contemporaneous objection was made to this argument. In fact, during her own closing, West's counsel made the following responsive remarks:

> . . . This is a -- I am not sure what Mr. Henderson said. This isn't Dodge City in 1880. I think Mr. Harris at one point said this isn't Abilene, Kansas. Can't just have shootouts on parking lots. People going to get killed. Going to be having this all the time.
>
> I tell you what, it's not Abilene, Kansas, in 1880. Because if it was and two people went out and acted in the manner that John Donald and Derenzy Turner did, they would have been hung on the spot. They didn't put up with that kind of behavior. And people had a

15

right to defend themselves. People still have the right to defend themselves if they are placed in a situation beyond their control.

This is not some vigilante thing where Vernon West went and took the law into his own hands. . . .

The prosecutor then responded in rebuttal as follows:

Ladies and Gentlemen of the Jury, where we are today is at a pivotal crossroads. As Ms. Skahan pointed out, this isn't Dodge City. It isn't whatever in 1880.

The use and possession of guns is ingrained in our heritage. People used to have to have guns. That's how they defended themselves. They walked out and they shot a buffalo. They needed them. They were going up the Chisholm Trail riding with a guy named Beryl Goodnight. They could have been attacked by Comanches or whatever. Or rustlers. They couldn't ride a hundred and fifty miles to --

MS. SKAHAN: Your Honor, I object. This is outside the record.

MR. HARRIS: She argued to that, Your Honor, about they would have strung somebody up in 1990 or 1880 or whatever.

THE COURT: All right. Just don't go too far, sir.

MR. HARRIS: The point is this, ladies and gentlemen, that's ingrained in our life, the possession of firearms. It is. The possession of firearms.

But we are here today in 1995. Times are different. In 1850--1880 in Dodge City, they didn't have 911. They didn't have gas stations, with people pulling up. They didn't have 9 millimeter. Glocks that can fire seventeen shots in five seconds.

When taken in context, it appears that all three attorneys utilized the example of the "lawless" Old West to make points in their arguments. The objection made by defense counsel appeared to concern not the example itself, but counsel's detailed recitation of particular facts about a particular individual traveling on the Chisholm Trail. The objection was not repeated during the last, simple reference to Dodge City in 1880. We do not find this colorful use of language to be misconduct on the part of the prosecutors.

16

As to the other statements objected to on appeal by the appellant, only a few were objected to during the trial. None were raised in the motion for new trial. It is well settled that without a contemporaneous objection to a prosecutor's statements, the error is waived. State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996); State v. Sutton, 562 S.W.2d 820, 825 (Tenn. 1978). We have carefully reviewed the record, and find no misconduct during argument that might have affected the jury's verdict to the defendant's detriment.

The issue concerning prosecutorial misconduct is without merit.

**V.**

While ineffective assistance of counsel claims may be raised on direct appeal merely on the record, such a practice is "fraught with peril". State v. Beard, No. 03C01-9502-CR-00044 (Tenn. Crim. App., Knoxville, September 26, 1996), quoting Wallace v. State, No. 01C01-9308-CC-00275 (Tenn. Crim. App., Nashville, September 15, 1994). This is because without an evidentiary hearing it is virtually impossible to demonstrate prejudice as required to prove such claims. Strickland v. Washington, 466 U.S. 668, 687, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984). Without proof, we can only speculate as to counsel's reasoning for her actions.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The Strickland standard has been applied, as well, to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n. 2 (Tenn.), cert. denied, 493 U.S. 874, 107 L.Ed.2d 164, 110 S.Ct. 211 (1989).

17

The standard for determining competency of counsel in Tennessee was first articulated in Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). We note that the approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct. If prejudice is not shown, we need not seek to determine validity of the allegations about deficient performance. Strickland v. Washington, 466 U.S. at 697, 104 S.Ct. at 2069.

Rule 8(c), Tennessee Rules of Criminal Procedure, provides that two or more defendants may be joined in the same indictment, presentment or information if each of the defendants is charged with accountability for each offense or if the offenses charged were part of a common scheme or plan or so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the others. A trial judge may, however, grant a severance prior to trial if ". . . it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants". Tenn. R. Crim. Pro. 14(c)(2)(i). Severance may also be granted if an out-of-court statement of a co-defendant makes reference to the defendant but is not admissible against him. Tenn. R. Crim. Pro. 14(c)(1)(iii).

The trials of these two co-defendants involved identical facts and witnesses. The peculiar facts made it extremely difficult to separate proof about one defendant or charge from proof of another. There were no problematic co-defendant statements. No legal basis exists to conclude that a pretrial motion to sever would have been granted. Therefore the failure to file such a motion does not demonstrate prejudice under Strickland, and the failure to move for a severance does not establish ineffective assistance of counsel.

West also complains about his attorney's failure to call John Donald, the severed co-defendant, to testify. However, he acknowledges in his brief that there

18

is "no way to forecast whether John Donald, Jr. would have taken his Fifth Amendment privileges, testified or had to answer some questions". The presentation of this argument highlights the reason why ineffective assistance of counsel claims should normally be raised by petition for post-conviction relief. A trial court usually must hear such a witness in order for the appellant to establish that the failure to call the witness denied critical evidence to the prejudice of the defendant. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither the trial court nor this court can speculate on what a witness' testimony might have been if introduced by defense counsel. Id. West has not met his burden of proof. This issue is without merit.

## VI.

Finally, West contends that his twenty-year sentence for second degree murder is excessive. This issue also was not raised in the motion for new trial. However, we choose to address it on the merits.

The sentence range for a Class A felony is fifteen (15) to twenty-five (25) years. The presumptive sentence for the defendant is the minimum sentence in the range before enhancement or mitigating factors are considered.[2] The trial court in this case sentenced the defendant to twenty (20) years, which is in the middle of the range.

When an accused challenges the length, range, or manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. §40-35-401(d). If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due

---

[2]T.C.A. §40-35-210. The crime occurred August 26, 1994. The defendant was sentenced July 21, 1995. Effective July 1, 1995, for crimes committed after that date, the presumptive sentence for a Class A felony is the mid-point of the range if there are no enhancement or mitigating factors.

consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered sentencing principles and all relevant facts and circumstances". State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. §§40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

In conducting a de novo review of a sentence, this court must consider:

(a)  the evidence, if any, received at the trial and sentencing hearing;

(b)  the presentence report;

(c)  the principles of sentencing and arguments as to sentencing alternatives;

(d)  the nature and characteristics of the criminal conduct involved;

(e)  any statutory mitigatory or enhancement factors;

(f)  any statement that the defendant made known on his own behalf; and

(g)  the potential or lack of potential for rehabilitation or treatment.

Tenn. Code Ann. §§40-35-102, -103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987). The burden is on the defendant to show that the sentence was improper. Sentencing Commission Comments, Tenn. Code Ann. §40-35-401(d).

20

In his brief West does not specify what mitigating factors the court failed to find. The trial court did find as mitigating factors under T.C.A. §40-35-113 (2) that the defendant acted under strong provocation and (9) that he assisted the authorities in locating the persons who were involved in the crime.

West also does not explain which enhancement factors he thinks were improperly applied. His argument focuses on his contention that he was an innocent bystander in these events. He recites that 400 community leaders signed a petition stating that he acted in self-defense. He does not dispute the application of the enhancement factors found by the trial court under T.C.A. §40-35-114:

> (1) Defendant has a prior history of criminal convictions and criminal behavior.
>
> (9) Defendant possessed a firearm during the commission of the offense.
>
> (13) The felony was committed while on probation.
>
> (16) The crime was committed under circumstances under which the potential for bodily injury to victims were great and
>
> (17) The person killed was someone other than the intended victim.

All of the enhancing factors found by the trial court are applicable here. Sentencing is within the discretion of the trial court, and the weight to be given any particular enhancement or mitigating factor lies within the court's discretion. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986). Having found the existence of five enhancement factors and only two mitigating factors, the trial judge acted within his discretion in imposing a sentence of twenty years. This issue is without merit.

For the reasons set forth above, the conviction of Derenzy Turner for first degree felony murder is reversed and dismissed. His conviction for attempted aggravated robbery is affirmed. The judgment of the trial court as to Vernon West is affirmed in all respects.

_____
CORNELIA A. CLARK
SPECIAL JUDGE


CONCUR:


_____
JOHN H. PEAY
JUDGE


_____
DAVID H. WELLES
JUDGE

**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT JACKSON**

**JULY 1996 SESSION**


| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. No. 02C01-9512-CR-00390** |
| | ) | |
| **Appellee,** | ) | **SHELBY COUNTY** |
| | ) | |
| **VS.** | ) | **Hon. Jon Kerry Blackwood, Judge** |
| | ) | |
| **DERENZY TURNER and** | ) | **(Felony Murder and Attempted Aggravated Robbery)** |
| **VERNON WEST,** | ) | **(Second Degree Murder)** |
| | ) | **Nos. 95-00953 and 95-0094** |
| **Appellants.** | ) | |


## JUDGMENT


Came the appellants, Derenzy Turner and Vernon West, by counsel and also came the attorney general on behalf of the state, and this case was heard on the record on appeal from the Criminal Court of Shelby County; and upon consideration thereof, this court is of the opinion that there is reversible error as to the appellant Turner's conviction for murder in the perpetration of a robbery.

It is, therefore, ordered and adjudged by this court that the judgment of the trial court is affirmed as to the appellant Turner's conviction for attempted aggravated robbery and as to the appellant West's conviction for second degree murder. It is further ordered by the court, pursuant to the opinion filed in this cause and incorporated herein, that the conviction of appellant Turner for murder in the perpetration of a robbery is reversed and dismissed.

Costs of this appeal will be borne two-thirds by the appellants and one-third by the state.


Per Curiam
Peay, Welles, Clark