WILLIAM PERKINS WILLIAMS *v.* THE STATE.*

(*Nashville,* December Term, 1931.)

Opinion filed July 2, 1932.

---

*As to responsibility for acts of co-conspirators, see 5 R. C. L., 1063; R. C. L. Perm. Supp., p. 1576; 13 R. C. L., 729; R. C. L. Perm. Supp., p. 3406; R. C. L. Pocket Part, title Homicide, Supp., 29.

As to comments on uncontradicted evidence, see 2 R. C. L., 429; R. C. L. Perm. Supp., p. 466.

JEFF MCCARN and CARMACK COCHRAN, for plaintiff in error.

W. F. BARRY, JR., Assistant Attorney-General, for defendant in error.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

Sam Walden and William Perkins Williams were indicted for the murder of John Joyce. Walden was convicted of murder in the second degree and given a maximum sentence of twenty years. Williams was convicted of the same offense and given a maximum sentence of ten years. Williams alone has appealed.

The killing occurred on the night of December 3, 1930, at a road house on the Franklin Pike, known as the Cool Goose Cafe.

Williams was born in Davidson County but went to Detroit a number of years since. The father, grandfather and other relatives of Williams lived in Davidson County and it was his habit to visit them at intervals. Walden also had relatives in this county. Shortly before the homicide, the two young men came down together from Detroit in Williams' automobile, a one-seated vehicle.

On the night of December 3 Walden and Williams got two girls in Nashville and drove out to this Cool Goose Cafe, reaching there, as we infer, somewhere about ten p. m. Some friends of the party were along in another car but this second party did not figure in the events to be detailed and need not be noticed further.

Upon reaching the Cool Goose Cafe Williams and Walden got out of the car and went into that place, taking with them two jars of whiskey which they had in the car, one a quart container and the other a pint container. The girls remained in the car. The boys stayed in the house a short while, returned to the car, and the party then drove to a dance hall some two miles further out the Franklin Pike. As stated above, it was a one-seated car. One of the boys drove, one of the girls sat in the middle and the other girl sat in the other boy's lap.

On the way out to the dance hall, Walden fired the loads out of a pistol, which had been brought along. The pistol seems to have been the property of Williams. When they reached the dance hall, Williams, who had carried some extra cartridges, reloaded the pistol, fired one shot in the air, and handed the pistol back to Walden. They remained at the dance hall only a short while and returned to the Cool Goose Cafe. The girls were again left on the outside in the car. Walden and Williams took their whiskey, or the remainder of it, into the cafe. The girls sat out in the car, according to their testimony, for about an hour before they returned. It is rather clear from the evidence of the girls that both Walden and Williams were under the influence of liquor when they entered this cafe the second time.

Some time later one Petty, in company with a man named King, came up in a car to the place and entered.

Still later a car in which the deceased Joyce was riding, along with two friends, arrived. Joyce got out and entered the cafe, as appears from the testimony of one of his friends, to buy some coca cola. Joyce's party were on their way to Nashville, had some whiskey, and wanted the coca cola to drink with it. The young men with Joyce did not go in. They all lived in Franklin.

The immediate facts of the tragedy are related by Petty alone. He was an intelligent witness and his story of the killing was not at all weakened by cross-examination, and as just said, is in no way contradicted on this record.

■ It was stated by one of the counsel for the State that King, who was with Petty, had been indicted for perjury in another case and for this reason was not offered as a witness. Neither was the proprietor of the place, who may have seen the killing, offered as a witness. It does not seem to us that the failure on the part of the State to offer the evidence of these men should at all count against the State's case. The men were equally available to the defendants.

Petty testified that when he entered the cafe, he went into a small room known as the kitchen. Walden and Williams were in that room drinking. The proprietor told them that Petty and King were all right and Walden and Williams insisted that Petty and King should take a drink and they did so.

Petty said that a little later Joyce came in, was vouched for by the proprietor, and while the proprietor was in the ice box, apparently getting Joyce's coca cola, Williams approached Joyce. Williams threw his arms around Joyce, Williams saying, "He is our buddy, he has

got a rod on, I feel it, and Joyce told him to go away and let him alone." Joyce said, "that he didn't want to play with him."

According to Petty, Walden told Williams to go away and let the man alone and Williams desisted and stepped back. Petty then told Joyce that "they were just playing, and he said let them go ahead, and do whatever they want to."

As Petty relates it, Williams then said, "Well, let me have him then, and started back towards Joyce."

As Williams started toward Joyce, Walden said, "Do anything you want to, I got mine out," and he looked around and Walden had his gun in his hand.

Petty further said that as Williams approached Joyce, but before he reached Joyce, Walden began firing his pistol into the body of Joyce, shooting him four times, inflicting wounds from which he died instantly.

From his testimony it seems that when Petty saw that Walden had drawn his pistol, he (Petty) tried to get Joyce out of the door, but had no time. When shot, Joyce had one hand on the doorknob and the other hand hanging at his side. He had made no hostile demonstration. Joyce was evidently irritated by the familiarity of Williams but did not resent it further than using the language above quoted. According to Petty, when Walden drew the pistol, Joyce said, "Let her pop."

Petty makes it plain that Williams was advancing on Joyce, starting from a point about eight feet distant, when Walden began firing. Walden had previously said, "Do anything you want to, I got mine out."

After the shooting Walden and Williams went out to the car where the girls were sitting. Walden returned to the house to get his overcoat and there is evidence to

the effect that he made a brutal remark about the dead man, which, however, does not reflect on Williams, and need not be considered. The party drove back to town and the boys immediately left for Detroit, from which place they were returned shortly. It is due Williams to say that through his family he notified the officers of his whereabouts and came back without making any trouble. The record does not show under what circumstances Walden was returned.

On the way back to town, both Williams and Walden told the girls that they had killed a man in this cafe and both men threatened the girls with death if they said anything about it. The girls were very closely ques tioned and an effort was made to have them confine their testimony in this respect to Walden. However, the young women all the while stated that Williams, as well as Walden, assumed responsibility for the killing and that Williams joined in the threats.

A number of witnesses were introduced who testified that Williams had enjoyed a good character here before going to Detroit. Some witnesses testified that he en joyed a good character in Detroit as well.

Notwithstanding the unusually able argument made in behalf of Williams, we can reach no conclusion but that this uncontradicted proof shows him to be guilty of murder in the second degree. He started to make an assault upon Joyce. His companion Walden, by his side, drew his pistol and said, "Do anything you want to, I got mine out." As Williams continued to advance, after this assurance from Walden but before reaching Joyce, Walden opened fire on Joyce. Williams was advancing under the protection of Walden's pistol. Both men were contemplating an assault without legal provocation.

The rule is that when men are assembled for an illegal purpose, the commission of an offense by any one of the party in pursuance of that purpose is the act of the whole. *Riggs* v. *State,* 43 Tenn. (3 Cold.), 85. In that case, however, the rule, while recognized, was not applied because the purpose was not known to be illegal by the defendant.

In *Irvine* v. *State,* 104 Tenn., 132, 147, the rule is said to be that "all those who assemble themselves together with an intent to commit a wrongful act, the execution thereof makes probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime. 1 Whar. Cr. Law, Sec. 220."

In *Beets* v. *State,* 19 Tenn. (Meigs), 106, the following is announced:

"The principle is this: if a party be engaged in an unlawful act, and another assist him and actually perpetrate the mischief, the first party shall be held responsible as though he had been the sole perpetrator himself. If a man is fighting with another not intending to kill, but by some unlucky blow death ensues, he is guilty of manslaughter; and why is this? Not because he intended to inflict death, but because he was engaged in an unlawful act, and the blow and the death were consequences of that act, and he must be responsible for it as though he had designed the result. Upon the same principle it is that he is responsible to the same extent, though the fatal blow be struck by another who assisted him without any concert on his part."

*Beets* v. *State* was somewhat modified in *White* v. *Conly,* 82 Tenn. (14 Lea), 51. In the last case it was held

that if the injury of which the deceased died was inflicted by a third person who, without the procurement, advice, consent or knowledge of the original assailant, intervened in an assault, the original assailant would not be chargeable with the consequences of the act of this third party. In that case the act of the third party was an independent act, which the original assailant had no reason to anticipate.

The test of the responsibility of one member of a party for the acts of another member of the party is concert of action and there was clearly such concert of action in the case before us. The effect of the decisions in other States has been well summarized as follows:

"There may be responsibility for a homicide committed in the execution of a common design, although the plan did not involve taking life. All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design, although not specifically contemplated by the parties, or even forbidden by defendant, or, although the actual perpetrator is not identified. Under this rule those who have joined in the common purpose . . . to commit a breach of the peace involving personal violence and the use of deadly weapons, or an assault involving danger to life, have been held responsible for a homicide committed by their accomplices in the further ance of the common object." 29 C. J., 1073.

To the same effect see 13 R. C. L., 729, 730.

In addition to the argument based on the sufficiency of the evidence, numerous other points are made, most

of them criticism of the speeches of the district attorney-general and other counsel appearing for the State below. Some of the language there used possibly merits this criticism. On the whole, however, the oratory complained of was flamboyant rather than vicious. It could not have affected the verdict of the jury as to Williams. As pointed out, there is no conflict in the evidence in this case. No verdict was possible upon this evidence other than a verdict of murder in the second degree and so far as Williams is concerned, the jury gave him the minimum punishment.

Complaint is made that counsel for the State, by reference to the fact that the evidence was uncontradicted, improperly drew the attention of the jury to the failure of defendants to testify in their own behalf. We think this criticism is answered by *Hays* v. *State,* 159 Tenn., 388.

Everything said in behalf of Williams' good character may be conceded by us, and it may be conceded that he was intoxicated on the night of this tragedy. The jury, however, made all the allowance for his intoxication that the law permits and this court can do no more. The killing of the young man Joyce was a wanton murder and except for the intoxication of those participating, the jury would doubtless have found them guilty of murder in the first degree.

We find no error on the record and the judgment is affirmed.