IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

MAY 1997 SESSION

FILED

December 11, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. No. 02C01-9608-CR-00267 |
| | * | |
| Appellee, | * | SHELBY COUNTY |
| | * | |
| VS. | * | Hon. Joseph B. Brown, Jr., Judge |
| | * | |
| CARLITO D. ADAMS, | * | (First degree felony murder--Two Counts) |
| | * | |
| Appellant. | * | |

For Appellant:

William D. Massey
3074 East Street
Memphis, TN 38128
(on appeal)

Brett Stein
236 Adams Avenue
Memphis, TN 38103
and
Wayne Chastain
147 Jefferson Avenue
Memphis, TN 38103
(at trial)

For Appellee:

John Knox Walkup
Attorney General and Reporter

Karen M. Yacuzzo
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

John W. Campbell
Assistant Attorney General
Criminal Justice Complex, Ste. 301
201 Poplar Street
Memphis, TN 38103

OPINION FILED:_____

AFFIRMED IN PART; REVERSED AND DISMISSED IN PART

GARY R. WADE, JUDGE

## OPINION

The defendant, Carlito D. Adams, was convicted of two counts of first degree felony murder and two counts of attempted first degree felony murder. He received concurrent life sentences for the felony murder convictions. The trial court imposed Range I, fifteen and twenty-five year sentences for the two attempted felony murder convictions, to be served consecutively to each other and to his life sentences, for an aggregate sentence of life plus forty years.

In this appeal, we have addressed the following issues:

(1) whether the convictions for attempted felony murder qualified as plain error;

(2) whether the evidence is sufficient to support the convictions for first degree murder during the commission of a felony;

(3) whether the trial court properly instructed the jury regarding felony murder;

(4) whether the trial court erred by admitting photographs of the crime scene in evidence;

(5) whether the trial court erred by allowing the victims' mothers to give irrelevant testimony during the guilt phase of this capital trial;

(6) whether the trial court erred by permitting cross-examination of a character witness concerning the defendant's juvenile arrest and charge for aggravated rape; and

(7) whether the trial court erred by imposing consecutive sentences.

We must reverse and dismiss the attempted felony murder convictions. Otherwise the judgment is affirmed. The defendant must serve two concurrent life sentences.

2

On the afternoon of April 20, 1992, four young men were sitting in a parked car on David Street in Memphis, smoking pot and drinking gin. Five or six male assailants approached the car. Words were exchanged. The victims were robbed at gunpoint and then shot repeatedly; Damond Dawson and Tracy Johnson died, Tommy Blackman fled to safety, and Eric Thomas was seriously injured but survived. The defendant acknowledged that he was among the group of assailants but denied any involvement in the robbery or killings.

Brenda Hudson, mother of twenty-year-old victim Tracy Johnson, testified that she last saw her son alive on in the morning of April 20, 1992 when she drove him to see his infant son. That afternoon, she saw her son lying dead on the sidewalk on David Street. She buried her son the next Saturday at Newpark Cemetery. Over objections by the defense, the trial court admitted a photograph of Johnson prior to his death. Over other objections and offers to stipulate, the trial court permitted the witness, openly tearful, to identify a photograph of her son's body.

Jonnie Dawson, mother of seventeen-year-old victim Damond Dawson, testified that her son had been an excellent football player and all around athlete. She last saw her son alive on April 20, 1992, just after football practice. Later that afternoon she learned that he had been shot. The trial court allowed the admission of a photograph of this victim taken while attending church the Sunday before his death. Over renewed objections and offers to stipulate, Ms. Dawson identified a photograph of her son's body, and then informed the jury that he had been buried at Memorial Park.

3

Eric Wayne Thomas, who survived the shooting, testified that he had known the victims Dawson, Johnson, Blackman, and the defendant all of his life. On the afternoon of the shooting, they were in Dawson's car parked in his driveway using marijuana and drinking gin. Dawson sat in the driver's seat. Johnson was in the front passenger's seat. Thomas sat directly behind Dawson and Blackman was seated next to Thomas. The defendant and three or four other males then approached the vehicle. The defendant ordered Blackman to exit the car, but he refused. Another male stood at the front passenger door holding a pistol. When Blackman got out of the car and ran toward the house, the defendant said "Get him!" A third male fired four or five shots in Blackman's direction. Thomas testified that the defendant was holding a pistol. He said that their assailants surrounded the car, robbed them of their jewelry and their money, and then shot them repeatedly. Thomas was first shot in the stomach and then the chest. The assailants started to leave and then re-opened fire on the front and rear-seat passengers, shooting Thomas in the leg. As he pretended to be dead, he heard someone say, "I think we got them." After the shooting, Johnson managed to cross the street where he collapsed and later died. Dawson, shot several times, was bleeding badly.

Tommy Blackman, a seventeen-year-old victim, testified that a few days before the shooting, he argued with the defendant over a basketball game. He had heard that the defendant was looking for him. He also revealed that he and the other victims were smoking marijuana and drinking gin in Dawson's car when the defendant, accompanied by another male, directed him to get out of the car. When he did not immediately respond, he saw the male accompanying the defendant draw a gun. Blackman pushed his way out of the car, knocking the defendant down in the process, and fled. He then heard someone say "he's going to the house." When he looked back, Blackman saw four or five other males approach the car, heard shots

4

fired, and felt a bullet graze his arm. Later, he found Johnson face down across the street. Thomas was in the back seat of the car asking for help and Dawson was slumped over in the front seat. Blackman asserted that no one in the car was armed with any type of weapon.

Eric Jones, seventeen years old, lived across the street from Damond Dawson and was returning home from a friend's house when the shooting incident occurred. He saw three males, including the defendant, surrounding Dawson's parked car. Two of them had guns. He overheard one of the assailants say, "Drop it off" just before the car occupants removed their jewelry. He also saw Blackman get out of the car and run toward the house. An unidentified male crossed the yard and shot at him and Blackman as each ran inside. Jones could not see whether the defendant, who was identified at trial, had a weapon.

Mary Jones, Eric Jones' mother, lived directly across the street from the Dawsons on David Street. On the afternoon of the crimes, she heard some gunshots and looked out her front door. She saw a truck in the street, almost stopped, blocking her view of the Dawson home. By the time it passed, she saw two males running along the driveway toward Dawson's parked car. Both carried guns and began to shoot as soon as they approached the Dawson vehicle. Ms. Jones did not see anyone leave the vehicle or run into the house. She did not see any indication of a robbery.

Frederick Sansom, of the Memphis Police Department, arrived at the scene that day at approximately 4:15 p.m. He described the scene, the locations of victims, spent shells, and blood evidence. He found no weapons in the car. During

5

his testimony, numerous photographs of the crime scene and the decedents were introduced in evidence over defense counsel objections.

Dr. O'Brien Smith, assistant professor of pathology at the University of Tennessee at Memphis and assistant medical examiner of Shelby County, performed both autopsies. He testified that a bullet went through Johnson's heart, causing his death. Dawson sustained five gunshot wounds, and, although he survived long enough to undergo surgery, the gunshot wounds caused his death.

Hez Benny Buckner, a witness for the defense, testified that he received a phone call from the defendant on the day of the shooting, during which the defendant claimed to have had an altercation with someone; the incident apparently involved a gun and the other person, who was believed to be Blackman, supposedly drove by the Adams' house slowly, as if to shoot. The defendant asked Buckner to pick up Kevin Shaw and come to his house. At Shaw's residence, they were joined by KB, Big D, and Scoot. The group proceeded to Adams' house. The six of them walked from the defendant's home to the Dawson residence on David Street to talk to Blackman. On the way, Shaw handed Buckner a .25 automatic. The defendant, walking ahead, apparently did not see the exchange. The defendant reached the Dawson residence first, approached the parked car, and opened the rear passenger door. Buckner did not hear the defendant say anything to Blackman. As the defendant opened the door, KB and Big D ran up to the car shooting; they demanded gold chains and a beeper. Big D fired shots in the back seat and KB ran around to the other side of the car to fire shots into the front seat. After the shooting began, the defendant ran past Buckner, followed by Shaw. At that point, Buckner ran and was followed by the others. When Buckner looked back, he saw one male exit the vehicle, run across the street, and collapse.

6

The defendant claimed that he and Blackman had an altercation while playing basketball and that Blackman had pulled a gun. When friends had intervened, Blackman left. The defendant took a detour home because he heard Blackman was waiting for him on the street. He decided to go talk it out with Blackman and called Buckner and Shaw to be witnesses. Several other males unknown to the defendant accompanied them. They walked to the Dawson residence. Shaw and the defendant approached the victims and asked Blackman to step outside so they could talk. The defendant testified that he had his back to the street, when Blackman, looking beyond the defendant, appeared startled and began to run. A shot was fired. The defendant turned, saw the three unknown males begin to shoot, and then ran home. He insisted that his only purpose was to talk to Blackman. He testified that he was surprised by the shooting, did not witness any robbery, and turned himself in to police upon learning he was being sought.

On cross-examination, the state impeached the defendant by use of his unsigned statement to police on the night of the offense. The defendant had stated that several of the men who accompanied him to David Street had pistols; he reported then that two men he did not know fired a lot of shots. He told officers that he took Shaw and Buckner in case he and Blackman fought. He acknowledged to the investigating officers that he told Blackman to get out of the car. He claimed that Dawson had then tried to pull out a pistol as his two unknown companions ran to the car and robbed Dawson. When confronted with his statement, the defendant admitted that he knew of the robbery and the guns only because Shaw had informed him of that just before he made his comments to the police.

The defense asked to call Joseph Terre, Jr., as a character witness. Terre is a school teacher who had taught the defendant history and homeroom

7

classes. Outside the presence of the jury, defense counsel elicited testimony that the defendant was truthful, honest, and peaceful. The state in turn, inquired as to his knowledge of the defendant's prior conviction for grand larceny, his juvenile adjudication for shoplifting, and his arrest and charge for aggravated rape. After lengthy discussions, the trial court ruled that if the character witness testified, the state could inquire as to the witness' knowledge of these specific incidences. The defense rested without calling the character witness.

After the jury returned guilty verdicts on two counts of felony murder and two counts of attempted felony murder, the penalty phase of the trial was begun to determine whether the defendant would be sentenced to death. George Richmond, who lived on David Street, said that the killings had an adverse effect on his neighborhood, "Everybody is fearful now." Ms. Hudson, explained that her son, Tracy Johnson, had been a "very good young man" who never gave her problems and was respectful of others. He had a child of four months at the time of his death. Ms. Dawson discussed the plans her son had made the day before his death, and relayed how he had a renewed determination to do well with his life. She testified that his death was "the end of her life."

Soloman Adams, the defendant's father, testified that the defendant worked for him in construction when not in school. He claimed his son was no more troublesome than any other kid, made good grades, and attended college in hopes of becoming an accountant. As far as he knew, the defendant had no involvement in gang activities. He described his son as "scared and just really torn apart" immediately after the shooting and asked the jury to spare his life.

Vanessa Adams, the defendant's step-mother, testified that the defendant was a "good kid" with high aspirations. She expressed her love for him, asked the jury to spare his life, and asserted that the defendant could be rehabilitated. Barbara Beloach, employed by Youth Service of Memphis, had helped the defendant become involved in their summer work program. She testified that the defendant was a quiet, respectful, and cooperative and could be rehabilitated. She asked the jury not to impose the death penalty. Loving DuBose, the defendant's mother, testified that her son had worked to attend college and that he had always been respectful. She also asked the jury to spare his life. James Patterson, the defendant's brother, also expressed love for the defendant and asked the jury to spare his life.

On the morning of the final day of the sentencing hearing, the trial court received a letter from a juror who stated that she had changed her mind and no longer wanted to vote guilty for murder; she favored a criminally negligent homicide verdict. Defense counsel sought a mistrial. The trial court denied the request but pointed out that the jury would likely be favorable to the defendant during deliberations as to sentence. At that point, the state sought a mistrial which the trial court denied.

The final witness for mitigation was Joseph Terre, the former high-school teacher of the defendant. Terre testified that the defendant had posed no disciplinary problems and seemed to be liked and respected by his peers. The defendant was never disrespectful and seemed to understand the importance of education. On learning of the charges against the defendant, Terre was astonished. He expressed the belief that the death penalty would not be appropriate.

9

I

Attempted felony murder is not recognized as a crime in Tennessee. The state concedes that, even though the defendant has failed to present this issue in this appeal.

Plain error may be noticed and brought to the attention of the appellate court even though not raised in the motion for new trial. State v. Ogle, 666 S.W.2d 58 (Tenn. 1984). The Tennessee Rules of Criminal Procedure provide, in part, as follows:

> (b) Plain Error.--An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.

Tenn. R. Crim. P. 52(b). This court is authorized, in its discretion, to consider issues not properly presented for review "(1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." Tenn. R. App. P. 13(b). Unless errors affect the fairness and integrity of the trial, they are not generally deemed to qualify as plain. State v. Wooden, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). A substantial right is one of fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature. Plain error is imposed only to prevent a manifest injustice. See State v. Goins, 705 S.W.2d 648, 650 (Tenn. 1986); State v. Brown, 693 S.W.2d 369, 371 (Tenn. Crim. App. 1985). In United States v. Causey, 834 F.2d 1277 (6th Cir. 1987), the court held the plain error doctrine is limited to errors "that strike at fundamental fairness, honesty, or public reputation of the trial. ..." Id. at 1281 (citations omitted).

Fundamental to our system of criminal justice is the requirement that offenses be clearly defined by the General Assembly. "Conduct does not constitute an offense unless it is defined as an offense by statute, municipal ordinance, or rule authorized by and lawfully adopted under a statute." Tenn. Code Ann. § 39-11-102(a). In 1996, our state's supreme court ruled that the offense of attempted felony murder does not exist in Tennessee. State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996). Thus, the defendant's convictions for attempted felony murder were dismissed:

> Considering that the legislature has already enacted specific offenses covering situations in which death or injury is threatened or occurs during the commission of certain felonies, we conclude that to extend the felony-murder rule to cases in which no death occurs would 'extend the scope of the doctrine beyond the pale of its statutory design and logical underpinnings.' [I]t is illogical that someone could intend to cause someone else's death through negligence or even recklessness. ... We conclude that one cannot intend to accomplish the unintended. Consequently, the offense of attempted felony-murder does not exist in Tennessee.

Id. 924 S.W.2d at 891-92 (citations omitted). We must, therefore, reverse and dismiss the defendant's convictions for attempted felony murder.

II

Next, the defendant contends that the evidence is insufficient to support the verdicts of felony murder because the state failed to prove that the defendant planned and intended to participate in a robbery and failed to prove that he was criminally responsible for the conduct of the other assailants. The state counters that the evidence was sufficient to show that the defendant was involved in a reckless killing during the perpetration of a robbery.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom.

11

State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as triers of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

At the time of the offense, felony murder was defined under the 1989 Act as "a reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1991). Robbery was defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1991).

In Williams v. State, 51 S.W.2d 482, 483-84 (Tenn. 1932), our supreme court set forth how the felony murder doctrine operated to hold co-felons liable for the acts of the principal:

> [W]hen men are assembled for an illegal purpose, the commission of an offense by any one of the party in pursuance of that purpose is the act of the whole. ... The test of responsibility of one member of a party for the acts of another member of the party is concert of action .... All who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design, although not specifically contemplated by the parties ....

Id. 51 S.W.2d at 483-84 (citations omitted). The death "must have had an intimate relation and close connection with the felony, ... and not be separate, distinct, and

12

independent from it...." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956).

Moreover, co-felons are responsible for the "natural and probable consequences" of

the acts of one another "committed in furtherance of such design even though the

killing was not specifically contemplated." Dupes v. State, 354 S.W.2d 453, 456

(Tenn. 1962). Thus, since 1932, the felony murder doctrine has been interpreted to

require something more than mere presence and participation in the underlying

felony; it has required some level of foreseeability as well as a nexus between the

felony and the killing. On the other hand, the felony murder doctrine has never

required that the defendant "specifically contemplate[]" the killing. Williams, 51

S.W.2d at 483.

In 1988, the General Assembly altered the statutory requirements of

felony murder, reflecting a strict liability approach: "[e]very murder ... committed in

the perpetration of, or attempt to perpetrate, any [enumerated felony] is murder in

the first degree." Tenn. Code Ann. § 39-2-202 (1988). In interpreting this statute,

however, our courts have retained portions of the interpretive language found in

Farmer, Dupes, and Williams. See State v. Brown, 756 S.W.2d 700 (Tenn. Crim.

App. 1988); State v. Severs, 759 S.W.2d 935 (Tenn. Crim. App. 1988). To render a

guilty verdict under the 1988 statute, the jury need determine only that the

defendant participated in the underlying enumerated felony. Brown, 756 S.W.2d at

704; State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992). In Brown, the

defendant argued that in order to be found guilty of felony murder, the jury must

conclude that the defendant "intended" to cause or assisted in causing the victim's

death. This court, relying on Dupes, disagreed:

> When one enters into a scheme with another to commit
> one of the felonies enumerated in [Tenn. Code Ann.] §
> 39-2-202 and death ensues, both defendants are
> responsible for the death, regardless of who actually
> committed the murder and whether the killing was
> specifically contemplated by the other. ... [A]s long as

13

> the defendant intended to commit the underlying felony (in this case, robbery) and death resulted in the perpetration of, or attempt to perpetrate, the underlying felony, the defendant is responsible for the murder, regardless of whether he intended for the victim to die or participated in the act of murder.

Brown, 756 S.W.2d at 704-05 (citations omitted). The court in Brown based its conclusion on Dupes but did not enunciate the "natural and probable consequence" principle as it was not directly implicated by the issues in that case. Other interpretive rules of the felony murder doctrine were also applied to the statute. To sustain a conviction for first degree felony murder, the killing must have been in pursuance of, rather than collateral to, the unlawful act described by the statute. Severs, 759 S.W.2d at 938 (citing Farmer, 296 S.W.2d at 883).

In 1989, the General Assembly redefined felony murder and added the culpability requirement of reckless:

> (a) First degree murder is:
>  (2) A reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202 (1989) (emphasis added).

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-401(c) (1989). Our supreme court discussed the policies that prompted addition of the reckless mens rea:[1]

---

[1] In Tennessee, felony murder is punishable by death. This discussion of the felony murder statute occurred in the context of the constitutionality of this penalty.

14

> The number of states allowing capital punishment for pure felony murder [where no culpability level is required] ... is a distinct minority. Tennessee moved out of that status in 1989 by amending its first-degree murder statute to provide that first-degree murder occurs only where a killing in the perpetration of one of the listed felonies is reckless.

Middlebrooks, 840 S.W.2d 317, 337 (Tenn. 1992) (citations omitted). Under the 1989 Act, the defendant's recklessness must be proved independently and cannot be "presum[ed] from the fact that the defendant was engaged in the commission of an enumerated offense when the killing occurred." State v. Frank Whitmore, C.C.A. No. 03C01-9404-CR-00141, slip op. at 20, (Tenn. Crim. App., at Knoxville, June 19, 1997), perm. to app. filed, (Aug. 20, 1997) (citing State v. Gilliam, 901 S.W.2d 385, 390 (Tenn. Crim. App. 1995)).

Accomplice liability generally provides another basis for a felony murder conviction. In 1989, the General Assembly amended our accomplice liability statute to provide that "[a] person is criminally responsible for an offense committed by the conduct of another if ... (2) [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402. An aider and abettor under this statute can be held criminally responsible not only for the criminal offense aided or abetted, but also for any other crime committed by an accomplice as a "natural and probable consequence of the crime originally aided and abetted." State v. Carson, 950 S.W.2d 951, 952 (Tenn. 1997). In describing a "natural and probable consequence," the court in Carson described that these are "harms [the aiders and abettors] have naturally, probably and foreseeably put in motion.... A "natural and probable consequence" in the "ordinary course of things" presupposes an outcome within a reasonably predictable range.'" Id. at 955 (citations omitted).

15

In Carson, the supreme court declared in dicta that the "[natural and probable consequences] principle also has been applied to accomplices under the felony murder doctrine: 'A defendant who is a willing and active participant in a robbery becomes accountable for all of the [natural and probable] consequences flowing from the robbery and may be convicted of first-degree murder where a co-perpetrator of the felony is the actual killer.'" Id. at 955, n.5 (emphasis added) (quoting Middlebrooks, 840 S.W.2d at 336; also citing Dupes, 354 S.W.2d at 456).

Thus, the question is whether the natural and probable consequences principle enunciated in Carson as "ha[ving] been applied to accomplices under the felony murder doctrine" also applies to the 1989 felony murder statute. We hold that it does. For an accomplice who is not the actual killer to receive a conviction of felony murder under the 1989 Act the state must prove the following:

> (a) the defendant recklessly participated in the underlying felony, Tenn. Code Ann. § 39-2-202 (1989);
>
> (b) the defendant was reckless as to the killing which occurred during the underlying felony, Id.;
>
> (c) that the killing was not independent or separate from the underlying felony, Severs, 759 S.W.2d 938; Farmer, 296 S.W.2d 883; and,
>
> (d) that the killing was a natural and probable consequence of the underlying felony. Williams, 51 S.W.2d 483-84; Dupes, 354 S.W.2d 456; Carson, 950 S.W.2d at 956.

Basic principles of statutory construction require courts to give effect to legislative intent without restricting or expanding a statute's coverage beyond its intended scope. Riggs v. Burson, 941 S.W.2d 44, 54 (Tenn. 1997); Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995). In examining statutory language, courts should apply the ordinary and plain meaning. Id. In addition, courts presume that the Legislature is aware of both its prior enactments and the law as it exists when new

16

legislation is passed. Wilson v. Johnson County, 879 S.W.2d 807, 810 (Tenn. 1994).

"The provisions of [the criminal code] shall be construed according to the fair import of their terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code. [Acts 1989, ch. 591, § 1.]" Tenn. Code Ann. § 39-11-104. The Sentencing Commission Comments provide as follows:

> The commission intends the language of the sections themselves to be an authoritative statement of the law. Since some of the terms utilized have been clearly defined by judicial decisions, those decisions and common law interpretations should be consulted where necessary.

Therefore, we rely on the plain language of the statute, the intent of the legislature, and the common law interpretations of the felony murder doctrine.

Our code dictates that "[a] person commits an offense who acts intentionally, knowingly, recklessly or with criminal negligence, as the definition of the offense requires, with respect to each element of the offense. Tenn. Code Ann. § 39-11-301 (emphasis added). Moreover, an intent to punish without the requirement of a culpable mental state must be clear from the language of the statute creating the offense. Pappas v. State, 188 S.W. 52 (Tenn. 1916). Here, the statute expressly requires a reckless mental state as to every element. Tenn. Code Ann. § 39-13-202 (1989). Next, applying common law interpretations of the statute, the state must prove that the resulting death was not independent from the felony. Severs, 759 S.W.2d at 938; Farmer, 296 S.W.2d at 883. And finally, the state must prove that the killing was a natural and probable consequence of the felony. Williams, 51 S.W.2d at 483-84; Dupes, 354 S.W.2d at 456; Carson, 950 S.W.2d at 956.

17

We conclude that the evidence here was sufficient to support the verdict. The defendant lead his accomplices to the Dawson residence on David Street. He approached the vehicle first. Thomas testified that the defendant had a weapon. The defendant ordered Blackman out of the car and, when Blackman began to run, the defendant yelled "Get him!" Eric Jones testified that he saw the defendant and two others standing by the car, heard one say, "Drop it off," and observed the victims removing jewelry. In his statement to police, the defendant acknowledged that he called his friends for "back up," was aware that several of his companions had weapons, and knew that a robbery occurred. The jury rejected his claim that he learned of the information second hand some time after the commission of the crimes. Thus, the evidence is sufficient to show that the defendant was reckless in his actions, knowingly participated in the robbery, and acted recklessly in regard to the victims. The evidence is also sufficient to show that the killings were not independent from the robbery and were a natural and probable consequence arising from the events. In our view, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

III

Next, the defendant contends that the trial court erred by failing to instruct the jury on the foreseeability or proximate cause requirement for felony murder. In other words, in order for the jury to find the defendant guilty of felony murder, they also must find that the killings were reasonably foreseeable to the defendant, not simply conceivable. The state argues that the trial court is not required to instruct the jury as to foreseeability or proximate cause, citing Middlebrooks. Rather, for a conviction of first-degree murder during the commission of a felony, the state contends that the statute "only requires that the murder be 'committed in the perpetration of' [the felony]." (citing Middlebrooks, 840 S.W.2d at

18

332). The state also points out that the defendant has waived this issue by failing to request special jury instructions. See State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). We hold that the jury instructions here were incomplete, but find the error to be harmless.

The trial judge is under a constitutional obligation to "declare the law" to the jury in the jury instructions. Tenn. Const., art VI, § 9. The trial judge has a duty to give a complete charge of the law applicable to the facts of the case. State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). It is presumed that the jury follows the instructions of the trial court. State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985); Klaver v. State, 503 S.W.2d 946 (Tenn. Crim. App. 1973). To determine if instructions are erroneous, our supreme court advises us to review the jury charge in its entirety. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). A charge causes prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. In Hodges, the court quoted the advisory language of the United States Supreme Court:

> '[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.'

Id. (quoting Boyde v. California, 494 U.S. 370, 380-81 (1990)); see also State v. Van Tran, 864 S.W.2d 465, 479 (Tenn. 1993).

The jury charge in this case was lengthy. First, the trial court instructed as to burden of proof and criminal responsibility for conduct of another. The instructions then covered the statutory elements of all the offenses charged, including lesser offenses; there followed instructions on the presumption of

19

innocence, reasonable doubt, credibility of and impeaching witnesses, accomplice as a witness, direct or circumstantial evidence, and the requirement of a unanimous verdict. As to the indictment for first degree felony murder, the jury was instructed as follows:

> Homicide: First degree murder (killing in the perpetration of other crimes)
>
> A person who commits first degree murder is guilty of a felony.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the alleged victim was unlawfully killed;
> (2) that the killing was committed in the perpetration of or the attempt to perpetrate the alleged robbery; that is, that the killing was closely connected to the alleged robbery and was not a separate, distinct and independent event; and
> (3) that the defendant intended to commit the alleged robbery; and
> (4) that the killing was the result of a reckless act by the perpetrators of the alleged robbery.
>
> ***
>
> When one enters into a scheme with others to commit a robbery and a killing ensues, all perpetrators may be held responsible for the death, regardless of who actually committed the murder and whether the killing was specifically contemplated by the others. As long as the perpetrators intended that the robbery be committed and a killing during the attempt to perpetrate the robbery, each perpetrator is responsible for the murder, regardless of whether he intended for the victim to die or participated in the act of murder.[2]

The omission of the natural and probable consequences language of Dupes, a long standing articulation of the felony murder doctrine in Tennessee and relied upon by our courts in Brown and Carson, was erroneous. Because we believe that this instruction "fairly submit[s] the legal issues" to the jury, the error, in our view, is harmless.

---

[2]This language comes directly from Brown, in which the court relied on Dupes.

IV

Next, the defendant claims that the trial court erred by admitting particularly prejudicial photographs which had little or no probative value. The defendant bases his argument on the fact that he did not contest that deaths or a robbery occurred. The state contends that the issue is waived because the defendant failed to identify which photographs were objectionable and also failed to include the photographs in the record.[3] In truth, the defendant has not identified which photographic exhibits he opposes. None, however, are so prejudicial as to warrant a new trial.

The photographs depict the victims Dawson and Johnson prior to their deaths. The crime scene, including the location of the car and the position of the victim Johnson where he fell across the street, appears among the photographs. Photographs of the car's exterior and interior and the location of bullets found inside and outside the car are also included.

The admissibility of photographs is governed by Tenn. R. Evid. 403. See State v. Banks, 564 S.W.2d 947 (Tenn. 1978). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." Tenn. R. Evid. 403. The evidence must be relevant and its probative value must outweigh any prejudicial effect. Banks, 564 S.W.2d at 950-51. Whether to admit the photographs is within the discretionary authority of the trial court and will not be reversed absent a clear showing of an abuse. State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

---

[3]The photographs were in the custody of this court as part of a co-defendant's record. The state's argument in this regard is misplaced.

Photographs of homicide victims, while alive, should not be admitted at trial unless relevant to a material issue; however, such an error is almost always harmless. See, e.g., State v. Dicks, 615 S.W.2d 126 (Tenn. 1981); State v. Strouth, 620 S.W.2d 467 (Tenn. 1981).

In our view, most of the photographs had adequate probative value to justify admission. The photographs helped support the state's theory that a robbery occurred and that the victims in the car were unarmed when they were attacked. None of the photographs were particularly bloody or gruesome. As for the photographs of the deceased victims prior to their deaths, "it would have been better had the 'before' picture of [the victim] been excluded since it added little or nothing to the sum total of knowledge of the jury." See State v. Christopher S. Beckham, C.C.A. #02C01-9406-CR-00107, slip op. at 19-20 (Tenn. Crim. App., at Jackson, Sept. 27, 1995) (remanded for sentencing) (quoting Dicks, 615 S.W.2d at 128) (alterations in original). In Beckham, where photographs of the deceased victim prior to death were admitted, this court recognized that the "evidence appears to have been offered by the prosecution for the sole purpose of invoking the sympathy of the jury." Beckham, slip op. at 20. Nonetheless, in context of the record as a whole, the error was found to be harmless. Id. We reach the same conclusion here. Although the photographs of the victims prior to their deaths should not have been admitted, we cannot say that the trial court so abused its discretion by their admission so as to have affected the verdict.

V

The first witnesses to give testimony were the mothers of the victims. Ms. Hudson testified that she last saw her son alive as she dropped him off at his infant son's home. She also testified about her son's burial. Ms. Dawson testified

22

that her son excelled at sports and that she had last seen her son alive that morning after his return from football practice. She implied that her son had attended church on Easter Sunday prior to his death. Both women were upset by these circumstances. The trial court, in overruling defense counsel's repeated objections, observed that "[Ms. Johnson]'s not giving a particularly graphic display of emotion. It's not unusual for what we're confronted with here today." "[I]n the Court's opinion, [Ms. Dawson] is not being any more or less emotional than is typical under the circumstances for a general corpus witness in a homicide case. ... She's not being hysterical." The defendant argues that this testimony was totally irrelevant, was introduced solely to impassion the jury, and qualified as an abuse of the trial court's discretion. The state contends that any error was harmless. We must agree with the state.

Under our rules, evidence is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In general, all relevant evidence is admissible; however, evidence, "[a]lthough relevant, ... may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 402, 403.

Ms. Dawson's testimony about her son's athletic ability, the implication that he attended church the previous Sunday morning, and the location of his burial were not relevant to any issue before the court and should have been excluded. Likewise, Ms. Hudson's testimony regarding her grandson, the victim's infant son, as well as the place of her son's internment were also irrelevant and should not have

23

been admitted, particularly during the guilt phase of the trial. In our review of relevant case law, however, we have found none which mandate a reversal. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Although the testimony of the victims' mothers was irrelevant, it was harmless and did not affect the judgment.

VI

The defense proffered Joe Terre, a former teacher of the defendant, as character witness. After a jury out hearing, the trial court ruled that if the defense asked Terre about the defendant's reputation for peace and quietude, cross-examination would be permitted as to his knowledge of the defendant's 1986 arrest and charge for aggravated rape. If the defense inquired about the defendant's reputation for honesty, then cross-examination would be permitted as to the defendant's 1985 shoplifting charge, and a 1989 conviction for grand larceny. The defendant argues that the rape charge was too remote and unsubstantiated to justify admitting it on cross examination. In addition, the defense argues that the prior arrest for aggravated rape is highly prejudicial.

In State v. Sims, 746 S.W.2d 191 (Tenn. 1988), our supreme court made the following observation:

> The State asserts that the cross-examination of the
> defendant's character witnesses as to her prior arrests,
> which did not result in convictions, was proper. The
> general rule in the majority of jurisdictions supports this
> type of questioning for this specific purpose. Our case
> law would appear to permit such questions after proper
> scrutiny, limitation, and instruction by the trial court. See
> State v. Badgett, [693 S.W.2d 917 (Tenn. Crim. App.
> 1985)]. The potential for prejudice in allowing such
> cross-examination, however, is great; and the rule seems

24

> to be regarded as [a] necessary evil by many of the courts that follow it.
>
> Such examination must be accompanied by an appropriate limiting instruction to the jury. The arrest should also involve an act or crime relevant to the character trait at issue.

Id. at 198. Furthermore, there is no special rule for juvenile arrests; therefore, on cross-examination, the state may inquire as to the witness' knowledge of any juvenile arrests of the defendant so long as the arrest is relevant to the character trait. Stepheny v. State, 570 S.W.2d 356, 359 (Tenn. Crim. App. 1978).

Although Sims and Stepheny predated the adoption of the Tennessee Rules of Evidence, nothing in the new rules indicates a change in the policy regarding prior juvenile arrests. Rule 405, Tenn. R. Evid., governs in this instance:

> (a) Reputation or Opinion.--In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. After application to the court, inquiry on cross-examination is allowable into relevant specific instances of conduct. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
>
>   (1) The court upon request must hold a hearing outside the jury's presence,
>
>   (2) The court must determine that a reasonable factual basis exists for the inquiry, and
>
>   (3) The court must determine that the probative value of a specific instance of conduct on the character witness' credibility outweighs its prejudicial effect on substantive issues.

The Advisory Commission Comments acknowledge that the witness may be asked about "rumored arrests and charges concerning the defendant. ..." Potential danger of misuse by the prosecution is the basis for the procedural guidelines set out in Rule 405. The trial court here complied with that procedure. The prior arrest for aggravated rape was probative of the defendant's character for peace and quietude.

25

Although the arrest occurred six years before the instant offense, we cannot say it was too remote to relate to the defendant's reputation. See State v. Fry, 35 S.W. 883 (Tenn. 1896) (evidence from six years previous not too remote). Furthermore, there was no evidence here that the arrest had been expunged. See Sims, 746 S.W.2d at 199. On this record, we find no error.

VII

The defendant challenges the imposition of consecutive sentences. The state has conceded that the defendant's convictions for attempted felony murder are void. As all consecutive sentences are disposed, we need not address this issue.

The judgment of the trial court is dismissed as to the attempted felony murder convictions. The convictions for felony murder are affirmed.

_____
Gary R. Wade, Judge

CONCUR:


_____
John H. Peay, Judge


_____
Thomas T. Woodall, Judge